PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DR. MIN LI, | ) | |
| | ) | CASE NO. 4:13cv2435 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| DR. QI JIANG, *et al.*, | ) | |
| | ) | **MEMORANDUM OF OPINION AND** |
| Defendants. | ) | **ORDER** [Resolving ECF No. 50] |

Pending before the Court is a motion for summary judgment filed by Defendants Dr. Qi

Jiang and Youngstown State University.  ECF No. 50.  The Court has been advised, having

reviewed the record, including the parties' briefs and the applicable law.  For the reasons that

follow, the Court grants Defendants' motion for summary judgment.

### I.  Factual and Procedural Background

Defendant Youngstown State University ("YSU") is a public university located in

Youngstown, Ohio.  ECF No. 54 ¶ 1.  Defendant Dr. Qi Jiang was the chair of YSU's

Department of Sociology, Anthropology and Gerontology ("Department") at the time that YSU

hired Plaintiff, Dr. Min Li.  ECF No. 50-6 ¶ 3.  Jiang's supervisor was Shearle Furnish, Dean of

the College of Liberal Arts and Social Sciences.  ECF No. 44 at PageID # 292, p. 38–39.  The

dean reported to YSU Provost Ikram Khawaja, who, in turn, reported to University President

Cynthia Anderson.  ECF No. 47 at PageID # 397, p. 14.  Jiang, Furnish, Khawaja, and Anderson

all held the same positions at the time Li applied for tenure.  ECF No. 54 ¶ 4.

(4:13cv2435)

YSU hired Li to work as an Assistant Professor in the Department, beginning in the fall of 2008.  Relevant to the instant dispute, both Li and Jiang are natives of Shanghai, China, and of Asian descent.  ECF No. 54 ¶ 5.  Li lived near Lansing, Michigan at the time that she interviewed with YSU, as she was a professor at Ferris State University in Michigan.  ECF No. 44 at PageID # 286, 288, p. 16, 23.  When Li came to Youngstown to interview for a position with YSU, Jiang allowed Li to stay at her house.  Id. at PageID # 288, p. 22.  Jiang recommended that YSU hire Li.  Id. at PageID # 288, p. 24.

Li's position was a tenure-track professorship with the Department.  YSU did not guarantee that Li would receive tenure.  ECF No. 54 ¶ 2.  As Chair of the Department, Jiang was Li's supervisor.  Id. ¶ 6.  Li promised to move her family from Michigan to Youngstown after she received her job; however, she did not purchase a home for about two years after she was hired.  ECF No. 44 at PageID # 288, 299, p. 23, 67.  Her family never moved to Youngstown.  Id. at PageID # 330, p. 190.  In addition, Li continued to teach online courses for Ferris State while employed by YSU.  During her first semester with YSU, Li taught nine credit hours at Ferris State.  ECF No. 49-13.  In total, Li received $9,450 per semester from Ferris State University for online courses taught during the 2008–09 academic year.  ECF No. 54 ¶ 15.  It is undisputed that Li did not report her continued employment with Ferris State to YSU administration until Spring 2010.  ECF No. 49-19.

According to the collective bargaining agreement ("CBA") that was in effect at all relevant times of this case, a professor needed to publish one peer-reviewed publication while employed at YSU and to teach four sections of classes each semester to become eligible to apply

2

(4:13cv2435)

for tenure.  ECF No. 44 at PageID # 289, 292, p. 28, 40.  Li acknowledges that YSU's

preconditions for applying for tenure are not onerous.  Id. at PageID # 289, 292, p. 28, 40.

Separate from the requirements for eligibility to apply for tenure, however, YSU reserved

awarding tenure to those applicants who have given "consistent evidence of quality performance

and promise during the probationary period."  ECF No. 49-3 at PageID # 559.

Tenure-track faculty could apply for tenure during their fourth, fifth, or sixth probationary

year at YSU.  ECF No. 49-3 at PageID # 559.  Under the CBA, a candidate for tenure could

choose whether their one shot at tenure would occur during their four, fifth, or sixth year at YSU.

Id.  Moreover, the CBA constrained the ability of YSU faculty involved in the tenure-review

process from commenting on the strength of a candidate's case for tenure and whether a

candidate should forgo applying until another year.  ECF No. 50-1 at PageID # 995.

During the 2008–09 academic year at YSU, Li received a Research Professorship ("RP")

and University Research Council ("URC") grant for the 2009–10 academic year.  ECF Nos. 44 at

PageID # 293, p. 43–44; 54 ¶¶ 12–13.  The RP excused Li from teaching a full course load,

which allowed Li to receive her full salary while devoting her extra time to scholarship.  ECF

No. 44 at PageID # 293, p. 44.  Li also received an RP and a corresponding reduction in course

load for the 2010–11 academic year as well.  Id. at PageID # 296, 298, p. 54–55, 64.  Li proposed

two ambitious research projects for these academic years, including writing up the results from

her research and presenting at national conferences.  ECF Nos. 49-9 at PageID # 681; 49-17 at

PageID # 734.  It is undisputed, however, that Li did not complete her own research proposals, as

she did not give any national presentations based on research from the RP's.  ECF No. 44 at

3

(4:13cv2435)

PageID # 300, 304, p. 72, 86.

Li received a faculty evaluation from Jiang every spring semester.  For the 2008–09 academic year, Jiang rated Li "Strong" for teaching, "Very Strong" for scholarship, and "Satisfactory" for university service.  ECF No. 49-7 at PageID # 650.  For the 2009–10 academic year, Jiang rated Li "Satisfactory" for teaching, "Very Strong" for scholarship, and "Strong" for university service.  ECF No. 49-14 at PageID # 714.  For the 2010–11 academic year, Jiang lowered Li's rating in scholarship to "Strong," noting:

> Now that Dr. Li has purchased a home in Boardman, I expect her to spend more of her time in the university in order to perform all responsibilities as a tenure-track full-time faculty. It is particularly important that Dr. Li will contribute more to both the Sociology and Gerontology programs, including advising, mentoring and recruiting students into these programs. I also expect to see the results (including publication) of her URC Research Professorship and upcoming FIL [Faculty Improvement Leave]

ECF No. 49-22 at PageID # 754–55.  Li understood that she was expected to publish results from her research.  ECF No. 44 at PageID # 299, p. 67.

In the Spring 2010 semester, Li first reported her outside employment with Ferris State to YSU.  ECF No. 49-19.  It was suggested to Dean Furnish that Li should be terminated for excessive outside employment, but Furnish decided to give Li another chance.  ECF No. 50-1 ¶ 7.  Furnish met with Li and Jiang to discuss Li's outside employment.  Dean Furnish informed Li that she was to be limited to teaching one course or three credit hours per semester at Ferris State.  Id. ¶ 8.  According to Li, Furnish instructed her to obtain a written statement from Ferris State to certify that the nine credits she taught online were the equivalent of a single three credit course in terms of preparation, but Li admits that she failed to obtain this statement because "nobody asked

4

(4:13cv2435)

me." ECF No. 44 at PageID # 298, p. 61–62.  Moreover, Li continued to teach more than three

credit hours at Ferris State after this meeting, even while on a reduced schedule at YSU.  Id. at

PageID # 313–14, p. 122–27.

Pursuant to the CBA, Li was required to go through pre-tenure review in either her third

or fourth probationary year at YSU.  ECF No. 49-3 at PageID # 559.  Li chose to undergo

pre-tenure review in the Spring 2012 semester.  ECF Nos. 44 at PageID # 301, p. 74; 54 ¶ 3.  As

part of the pre-tenure review, Li gave a presentation to faculty members, who in turn submitted

anonymous suggestions for Li to improve her bid for tenure.  ECF Nos. 44 at PageID # 301, p.

74–75; 54 ¶ 23.  Jiang went over the anonymous comments with Li.  ECF No. 47 at PageID #

403, p. 37–38.  Although Li does not recall meeting with Jiang (ECF No. 44 at PageID # 302, p.

79), an email exchange between Li and Jiang suggests that the two went over Li's pre-tenure

review on March 29, 2012.  ECF No. 49-24.  Jiang recalls sharing with Li the comments from the

tenured professors to whom Li presented.  One of the four professors submitted positive

comments, but three others indicated numerous areas of improvement for Li, including

involvement with students, publications, presentations, and fulfilling goals established by her

research proposals.  ECF No. 47 at PageID # 403, p. 37–38.

Li also met with Dean Furnish during the Spring 2012 semester.  Li claims that Furnish

told her, in relation to tenure, that she should be fine.  ECF No. 44 at PageID # 303, p. 82.

Furnish averred that, if he made this comment, it was in relation to her eventual application for

tenure, not an application for the following fall.  ECF No. 50-1 ¶ 13.  In fact, Jiang and Furnish

had previously discussed, along with other members of YSU's administration, Jiang's

5

(4:13cv2435)

reservations about Li's readiness for tenure and whether Jiang could tell Li to defer applying for tenure by a year.  *Id.* at PageID # 994–95.  Because it was determined that the CBA forbade Jiang from expressly warning Li, administrators decided to signal Li's lack of readiness.  *Id.*  Accordingly, in Li's 2011–12 academic year evaluation, Jiang stated that she expected "Li to become even more engaged with her work as a tenure-track, full-time faculty," and "to see more publications out of [Li's] scholarly work and conference presentations at the national level." ECF No. 49-25 at PageID # 773.  Dean Furnish also issued a memo to Li which counseled Li to focus on, among other items, "positive scholarship outcomes, e.g., publication with first authorship."  ECF No. 49-26.  The memo concluded by observing that "there is great value in this pre-tenure review and that the comments and suggestions have significant potential to positively influence your eventual case for tenure."  *Id.*  Li also acknowledges that Jiang spoke to her at some point prior to September 1, 2012, and that Jiang told her that the dean is recommending that Li wait another year, but that it was ultimately Li's decision about when to apply.  ECF No. 44 at PageID # 304, p. 85.

Li applied for tenure at YSU on September 1, 2012.  ECF No. 54 ¶ 3.  She did not publish any articles or present at national conferences in the time between her pre-tenure review and her tenure application.  *Id.* ¶ 25.  The two articles that Li submitted as part of her tenure application were based on research completed prior to working at YSU and did not incorporate any research completed during her RP's.  ECF No. 49-37 at PageID # 835 (explaining that her two articles were already in press by the time she applied for RP's and, therefore, the articles logically could not be a part of the research at YSU).  Li presented to the tenured faculty members of her

6

(4:13cv2435)

department (Professors 1 through 6, and Jiang) for her tenure review on September 12, 2012.

ECF No. 54 ¶¶ 28–29.  The six faculty voted unanimously to recommend Li for tenure.  *Id.* ¶ 30.

Despite this vote, two of the professors that voted in her favor averred that they did so

reluctantly.  ECF Nos. 50-4 ¶ 11 (stating that the yes vote was because Professor 1 did not want

Li to receive tenure with knowledge that Professor 1 had voted against tenure); 50-5 ¶ 8 (stating

that the yes vote was to promote department harmony).

The CBA authorizes the department chair to make a separate recommendation from the

faculty.  ECF No. 49-3 at PageID # 560 ("By September 30, the department chair shall make a

separate recommendation on the candidate to be forwarded to the dean of the college . . . .").

Jiang recommended that Li should not receive tenure on September 28, 2012, contrary to the

unanimous vote of the faculty.  ECF No. 54 ¶¶ 33–34.  Jiang felt that the "unprecedented"

amount of release time that YSU had given Li did not translate into a sufficient output of

scholarship, and that Li lacked commitment to the university and the department.  ECF Nos.

49-31; 54 ¶ 34.  Dean Furnish conducted an independent review of Li's candidacy, separately

recommended denying tenure, and forwarded the recommendation to Provost Khawaja.  ECF

Nos. 50-1 ¶ 14; 54 ¶ 35.  The Provost concurred and transmitted his recommendation and those

of the Dean, Chair and Department faculty to then-President Cynthia Anderson.  ECF No. 54 ¶

36.  After reviewing Li's personnel file and the recommendation of the Chair, the Dean, and the

Provost, Anderson denied tenure to Li.  ECF No. 54 ¶ 37.

Li exercised her right to appeal the decision to deny tenure.  Pursuant to the CBA, a

tenure appeal committee submits a recommendation on the appeal to the President.  ECF No. 54

(4:13cv2435)

¶ 38.  Upon receipt of the recommendation, the President makes the final decision as to tenure.

ECF No. 49-3 at PageID # 560 ("The president's decision shall be final and binding on the

University, the Association, and the appellant.").  The committee unanimously recommended

affirming the denial of tenure.  ECF No. 54 ¶ 41.  Following this recommendation, Li requested a

meeting President Anderson to discuss the denial of tenure decision.  ECF No. 44 at PageID #

312, p. 120.  Anderson wrote Li a letter on February 28, 2013, to inform Li that she reviewed the

report of the tenure appeal committee, and that she decided to affirm the denial.  ECF No. 49-41.

Following the final decision to deny tenure, Li taught the 2013–14 academic year on a one-year

contract, which has since expired.  ECF No. 54 ¶ 47.  During that academic year, Jiang forwarded

Li at least two job listings for tenure-track positions at a Michigan university.  ECF No. 49-65.

Two separate, yet related, series of events ran parallel to Li's denial of tenure.  The first

concerned Li's outside employment.  On September 20, 2012—eight days after the faculty vote

on tenure but eight days before Jiang's contrary recommendation—Li submitted her outside

employment form for the Fall 2012 semester.  ECF No. 49-48.  This prompted Jiang to search

Ferris State's public website for course listings.  Jiang determined that Li underreported the

number of semester hours that she had worked at Ferris State: Li had taught 45 semester hours at

Ferris State despite reporting that she had taught 18 semester hours, and that Li had taught 30

semester hours while on release time for research with YSU.  ECF No. 49-49 at PageID # 860.

Jiang reported these findings to Furnish, who in turn referred the matter to YSU's Professional

Conduct Committee.  ECF No. 50-1 ¶ 15.  Although the Professional Conduct Committee

eventually recommended that Li receive a written reprimand for potentially misleading YSU

(4:13cv2435)

about her outside employment (ECF No. 49-52), the matter was still pending when Furnish

recommended denying tenure.  ECF No. 50-1 ¶ 15.  Furnish did not base his recommendation

denying tenure on the underreporting allegations.  *Id.*

The second concerned an email exchange between Li and Jiang on September 14,

2012—two days after Li's presentation to the faculty but two weeks before Jiang recommended

against tenure.  Jiang forwarded Li and other Chinese individuals an email concerning protests in

Shanghai, China over mass killings committed by the Japanese during World War II.  ECF No.

49-62.  Jiang and Li dispute the nature of their conversation surrounding this email.  Jiang

maintains that she did not discuss the email with Li after she forwarded it to Li.  ECF No. 47 at

PageID # 405, p. 46.  Li claims that Jiang accused Li of betraying her own people (ECF No.

49-63 at PageID # 912–13), but concedes that Jiang did not threaten to recommend denying Li

tenure over the email and their alleged conversation.  ECF No. 44 at PageID # 321, p. 153.

On September 23, 2013, Li filed lawsuit in state court.  ECF No. 1-1.  Defendants

removed the case to federal court (ECF No. 1) and moved for judgment on the pleadings.  ECF

No. 4.  On August 13, 2014, the Court granted in part and denied in part Defendants' motion.

ECF No. 15.  Thereafter, the case proceeded on Li's Title VII claim against YSU and Li's § 1983

claim against Jiang in her individual capacity.  Defendants moved for summary judgment.  ECF

No. 50.  Li opposed (ECF No. 57); Defendants replied.  ECF No. 59.  The matter is ripe for

adjudication.

## II.  Legal Standard

Summary judgment is appropriately granted when the pleadings, the discovery and

9

(4:13cv2435)

disclosure materials on file, and any affidavits show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005). The moving party is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party must "show that the non-moving party has failed to establish an essential element of his case upon which he would bear the ultimate burden of proof at trial." *Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 403 (6th Cir. 1992).

After the movant makes a properly supported motion, the burden shifts to the non-moving party to demonstrate the existence of material facts in dispute. An opposing party may not simply rely on its pleadings; rather, it must "produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995). A fact is "material" only if its resolution will affect the outcome of the lawsuit. In determining whether a factual issue is "genuine," the court must evaluate whether the evidence could persuade a reasonable factfinder that the non-moving party is entitled to a verdict. *Id.*

To defeat a motion for summary judgment, the non-moving party must "show that there is doubt as to the material facts and that the record, taken as a whole, does not lead to a judgment for the movant." *Guarino*, 980 F.2d at 403. In reviewing a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party when deciding whether a genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio*

10

(4:13cv2435)

*Corp.*, 475 U.S. 574, 587–88 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).  The

existence of a mere scintilla of evidence in support of the non-moving party's position ordinarily

is not sufficient to defeat a motion for summary judgment.  *Klepper v. First Am. Bank*, 916 F.2d

337, 342 (6th Cir. 1990).

### III.  Analysis

Defendants have moved for summary judgment on both of Li's remaining claims: a Title

VII claim against YSU for national origin discrimination and a § 1983 claim against Jiang in her

individual capacity for First Amendment Retaliation.

### A.  Title VII Claim

Title VII makes it unlawful for an employer to discriminate against an individual based

on her national origin.  42 U.S.C. § 2000e-2(a)(1).  "In order to establish a claim under Title VII,

a plaintiff must present either direct or circumstantial evidence of discrimination on the part of

the employer."  *Wheat v. Fifth Third Bank*, 785 F.3d 230, 237 (6th Cir. 2015).  Proof of

discrimination through circumstantial evidence follows the three-step framework developed in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Plaintiff must first establish the

*prima facie* case for discrimination by showing that (1) she is a member of the protected class,

(2) she suffered an adverse employment action, (3) she was qualified for the position, and (4) she

was replaced by someone outside of the protected class, or was treated less favorably than a

similarly situated individual outside the protected class.  *Wheat*, 785 F.3d at 237 (quoting *Laster

v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014)).  The burden then shifts to the employer

to articulate a legitimate, non-discriminatory reason for the adverse employment action.  *Texas*

11

(4:13cv2435)

*Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) (quoting *McDonnell Douglas*, 411 U.S. at 802).  When the employer does so, the employee must demonstrate that the employer's proffered explanation was pretext for discrimination.  *Wheat*, 785 F.3d at 240.  "A plaintiff may demonstrate that an employer's explanation is not credible by demonstrating that the proffered reason (1) had no basis in fact, (2) did not actually motivate the employer's action, or (3) was insufficient to motivate the employer's action."  *Harris v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*, 594 F.3d 476, 486 (6th Cir. 2010).

Under the cat's paw theory of liability, an unbiased decisionmaker takes an adverse action based on conduct of a supervisor motivated by discriminatory animus.  In *Staub v. Proctor Hospital*, 562 U.S. 411 (2011), the Supreme Court held that an employer may be held liable "if a supervisor performs an act motivated by [discriminatory] animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action . . . ."  *Staub*, 562 U.S. at 422.  To impute the supervisor's animus onto the employer under *Staub*, the employee must show that (1) the supervisor intended to cause an adverse employment action, and (2) the discriminatory action taken by the supervisor is a proximate cause of the adverse employment action.  *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 351 (6th Cir. 2012) (quoting *Staub*, 562 U.S. at 422).  Causation will not be found when the "decisionmaker undertakes an investigation which results in an adverse action for reasons unrelated to the supervisor's original biased action."  *Id.*  "But the supervisor's biased report may remain a causal factor if the independent investigation takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified."

12

(4:13cv2435)

*Staub*, 562 U.S. at 421.  Although *Staub* involved a claim brought under the Uniformed Services

Employment and Reemployment Rights Act, 38 U.S.C. § 4311, the cat's paw theory of liability

has been applied in cases involving claims brought under Title VII as well.  *Chattman*, 686 F.3d

at 351 n.10.

### 1. *McDonnell Douglas* Burden Shifting

Li argues that she can establish the *prima facie* case for discrimination under *McDonnell*

*Douglas*.  ECF No. 57 at PageID # 1049.  She argues that, contrary to Defendants' assertion, she

can show that she was replaced by someone outside the protected class.  *Id.* at PageID # 1050.

Li's argument is that the professorship she would have received "of course, required hiring a new

professor, and YSU does not say otherwise."  *Id.*

Even if it were assumed that Li could establish the *prima facie* case for national origin

discrimination—a generous assumption, because Li has not offered any evidence of the national

origin of this replacement professor—YSU has articulated a legitimate, non-discriminatory

reason for the denial of tenure.  YSU contends that it denied tenure to Li because "[a]s of

September 2012, she failed to produce a record of scholarship sufficient to deserve tenure."  ECF

No. 50 at PageID # 973.  The record reflects that Jiang (Li's Department Chair), Furnish (the

Dean), Khawaja (Provost), the tenure appeal committee, and Anderson (YSU's President, and the

ultimate decisionmaker) all conducted independent reviews of Li's tenure application and had

reservations about her scholastic productivity despite the amount of leave time afforded to Li to

accomplish her research.  This satisfies YSU's burden of articulating a legitimate

non-discriminatory reason for denying tenure.

13

(4:13cv2435)

Li does not address these arguments in opposition. She does not argue that YSU's decision to deny tenure—her failure of producing scholarship worthy of tenure—had no basis in fact, did not actually motivate YSU's action, or was insufficient to motivate YSU's action. ECF No. 57 at PageID # 1049–50 (discussing the *prima facie* case for discrimination without mentioning any other step of the *McDonnell Douglas* analysis). Li has failed to create a genuine issue of material fact as to pretext.

### 2. Cat's Paw

Li argues that the cat's paw theory of liability supports denying summary judgment. Li suggests that the email sent by Jiang is evidence of the discriminatory animus that motivated Jiang to recommend denying tenure to Li, as well as to investigate Li's underreporting of outside employment. ECF No. 57 at PageID # 1048–49. Li also claims that Jiang's actions proximately caused the denial of tenure. Specifically, Li contends that Jiang's recommendation was effectively "rubber stamped" by every rung of the tenure review ladder, and that fact precludes summary judgment on the issue of whether YSU's denial of tenure would have stood absent Jiang's negative recommendation. Li is unable to create a genuine issue of material fact as to either requirement for cat's paw liability, however.

The only evidence in the record of discriminatory intent towards Chinese individuals is the conversation between Li and Jiang about the email, during which Lit contends Jiang called Li a betrayer. To survive summary judgment, however, Li must present "more than a mere scintilla of evidence in support of her position." *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). In this case, the inference of discriminatory animus that Li argues can be inferred from the

14

(4:13cv2435)

conversation between Li and Jiang is undermined in two respects.  It is undisputed that Jiang

recommended that YSU hire Li, and that Jiang let Li stay at Jiang's house when Li came from

out of town to interview for a position with the university.  ECF No. 44 at PageID # 288, p. 22,

24.  Jiang, therefore, was the same actor that recommended the hiring of, and denial of tenure for,

Li.  This same actor inference weakens the case that Jiang discriminated against Li.  *See Garrett*

*v. Sw. Med. Clinic*, No. 15-1020, 2015 WL 7567626, at *5 (6th Cir. Nov. 25, 2015) (recognizing

the presumption that membership in the protected class did not motivate an adverse employment

action when the same actor hired the individual).  Moreover, documentary evidence reveals that

YSU's stated reason for denying tenure to Li—her insufficient scholastic record—was a concern

held by Jiang prior to Li's application for tenure, as well as any conversation discussing the email

supposedly evincing discriminatory animus.  ECF No. 50-1 at PageID # 994–95 (emails from

Jiang, dated March 28, 2012, which highlight her concerns with Li's readiness for tenure and

seek advise as to whether she can recommend that Li wait a year to apply for tenure).

Consistency on this point further undercuts any inference of discrimination surrounding the email

and conversation.  The totality of Jiang's relationship with Li, therefore, undermines any

inference of discriminatory animus.

> Even assuming that Jiang acted with discriminatory animus, Li has also not demonstrated

that Jiang proximately caused her termination.  Under *Staub*,

> if the employer's investigation results in an adverse action for reasons unrelated to
> the supervisor's original biased action . . . , then the employer will not be liable.
> But the supervisor's biased report may remain a causal factor if the independent
> investigation takes it into account without determining that the adverse action
> was, apart from the supervisor's recommendation, entirely justified.

(4:13cv2435)

*Staub*, 562 U.S. at 421. YSU's tenure review procedure fits within *Staub*'s conception of an independent investigation that breaks the causal chain. The CBA provides that the college dean and the provost make separate recommendations in the tenure review process. ECF No. 49-3 at PageID # 560. President Anderson reviewed Li's candidacy for tenure—separate and apart from the reviews of the dean and the provost—and decided that Li fell short of deserving tenure. ECF No. 50-2 ¶ 6. When Li exercised her appellate rights to have the tenure decision reviewed, the tenure appeal committee conducted a separate review of Li's tenure application, comments from her colleagues, and the reviews submitted previously. ECF No. 50-3 ¶¶ 7–10. Following the committee's decision to affirm the denial of tenure, President Anderson again reviewed Li's application for tenure, including meeting with Li for about forty minutes prior to making any final decision. ECF No. 50-2 ¶ 8. Therefore, five different levels of review independently examined Li's case for tenure, and found denial warranted.

To contest the independent nature of the review, Li only marshals the testimony of Professor 4, who believes that every person in the tenure review chain just agrees with the recommendation of the person beneath them. ECF No. 46 at PageID # 386, p. 74–76. Professor 4 admitted to having no personal knowledge of what the dean, the provost, or the president considered when making their decisions. *Id.*, p. 76 ("But, you know, I don't know what else they did, but that seems to be the way."). Professor 4's conjecture cannot create a genuine dispute as to the independence of each level of tenure review.

The undisputed evidence, the CBA, and the individuals involved in the tenure review process reflect that multiple, independent inquiries into a tenure candidate's qualifications. The

16

(4:13cv2435)

denial of tenure in this case is not like the situation identified in *Staub* where the allegedly biased report remains a causal factor because "the independent investigation takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified." *Staub*, 562 U.S. at 421. Causation, therefore, is also absent.

### B. First Amendment Retaliation Claim

First Amendment retaliation claims are also analyzed under a burden-shifting framework. The initial burden falls on the plaintiff to establish the *prima facie* case for retaliation. To demonstrate the *prima facie* case, a plaintiff must show that (1) she engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against her that would deter a person of ordinary firmness from continuing to engage in that conduct; (3) the adverse action was motivated at least in part by his protected conduct. *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012). "Even if the employee establishes that [her] protected conduct was a motivating factor behind his termination, the employer is not liable if it can show that it would have made the same employment decision even if the employee had not engaged in the protected activity." *Haji v. Columbus City Sch.*, 621 F. App'x 309, 314 (6th Cir. 2015). "Summary judgment is warranted if, in light of the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant." *Dye*, 702 F.3d at 294–95 (quoting *Eckerman v. Tenn. Dep't of Safety*, 636 F.3d 202, 208 (6th Cir. 2010) (internal quotation marks omitted)).

Li argues that she has satisfied all three elements of the *prima facie* case for First Amendment retaliation, and therefore the case should proceed to trial on the claim. Li states that

17

(4:13cv2435)

she engaged in protected conduct by declining to speak; specifically, by refusing to forward the email relating to the Shanghai protests.  She also argues that the decision to recommend against tenure would chill future speech, especially when, as Li argues is the case with YSU, Jiang's recommendation would just be "rubber stamped up the tenure review chain of command."  ECF No. 57 at PageID # 1053.

Even if Li could establish the *prima facie* case, her claim would fail because the undisputed evidence reveals that Defendants would have taken the same action regardless of the protected conduct.  It is undisputed that, following Li's pre-tenure review in early 2012, only one professor spoke positively of her presentation, compared to three expressing the need for Li to improve her scholarship.  ECF No. 47 at PageID # 403, p. 37–38.  These mixed reviews prompted Jiang to inquire into whether she could warn Li not to apply for tenure in the fall.  Jiang could not do so, however, because the CBA forbade express comments on when a professor should apply for tenure.  ECF No. 50-1 at PageID # 994–95.  Instead, Jiang and Furnish both suggested that Li increase her scholastic output and present at national conferences.  ECF Nos. 49-25 at PageID # 773; 49-26 at PageID # 776 ("I find that there is great value in this pre-tenure review and that the comments and suggestions have significant potential to positively influence your *eventual* case for tenure." (emphasis added)).  Li also recalled that Jiang conveyed to her that, even though Li had to decide when to apply, the dean suggested waiting a year.  ECF No. 44 at PageID # 304, p. 85.  Notwithstanding these indications, Li applied for tenure that fall without taking any steps to improve her case for tenure, such as publishing articles or presenting at national conferences.  ECF No. 54 ¶ 25.  All of these actions pre-dated the email and alleged

18

(4:13cv2435)

conversation between Li and Jiang.  Li has presented no evidence to cast doubt on the sincerity of

Defendants' reservations that existed prior to Li applying for tenure.  Summary judgment is

therefore appropriate on Li's retaliation claim.  *See Haji*, 621 F. App'x at 314–15 (holding that

the district court erred in concluding that the plaintiff could not establish the prima facie case, but

affirming the grant of summary judgment because the undisputed evidence reflected that the

employer would have taken the same employment action even if the plaintiff had not engaged in

protected activity).

### IV.  Conclusion

For the forgoing reasons, the Court grants Defendants' motion for summary judgment.

ECF No. 50.


IT IS SO ORDERED.


 February 29, 2016                             /s/ Benita Y. Pearson
Date                                     Benita Y. Pearson
                                         United States District Judge

19